111 P.3d 369

STATE of Arizona, Appellee,

v.

Frank Winfield ANDERSON, Appellant.

No. CR–02–0402–AP.

Supreme Court of Arizona,
En Banc.

May 4, 2005.

Terry Goddard, Attorney General, by Kent E. Cattani, Chief Counsel Capital Litigation Section, Phoenix, and Robert J. Gorman, Assistant Attorney General, Tucson, Attorneys for the State of Arizona.

Law Offices of Thomas J. Phalen, by Thomas J. Phalen, Phoenix, and Law Offices of Thomas A. Gorman, by Thomas A. Gorman, Sedona, Attorneys for Frank Winfield Anderson.

## OPINION

HURWITZ, Justice.

¶ 1 Frank Winfield Anderson ("Anderson") was convicted in 1998 in Mohave County Superior Court of armed robbery, conspiracy to commit first-degree murder, and three counts of first-degree murder. In 2001, we

overturned these convictions because the trial court failed to permit defense counsel to attempt to rehabilitate jurors with respect to answers in a written questionnaire indicating opposition to the death penalty. *State v. Anderson*, 197 Ariz. 314, 4 P.3d 369 (2000) (*"Anderson I"*). After remand, Anderson was again convicted on all counts.

¶ 2 Because Anderson received death sentences for the three murders, an automatic notice of appeal was filed pursuant to Arizona Rule of Criminal Procedure 31.2(b). This Court has jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") § 13–4031 (2001).

## I. Factual and procedural background

¶ 3 In late July 1996, Anderson, then forty-eight years old, and Kimberly Lane, his fourteen-year-old traveling companion, left their homes in Lancaster, California and traveled to Nevada. On August 10, 1996, the two were hitchhiking in Las Vegas and were picked up by a man who knew a family near Kingman that took in boarders. The man drove Anderson and Lane to a residence in Golden Valley, approximately seventeen miles from Kingman. The residence was the home of Leta Kagen, her fifteen-year-old son Robert Delahunt, her husband Elliot Kagen, and Roland Wear. Robert Poyson, then nineteen, had also been staying there for about six months.

¶ 4 Anderson and Lane stayed at the Kagen home for several days. They decided to move on, but had no means to leave Golden Valley. Anderson, Lane, and Poyson therefore decided to kill the residents of the Kagen home and steal Wear's pickup. On August 13, while Elliot Kagen was attending a sick friend in Kingman, the three set their plan into action.

¶ 5 At approximately 8:00 p.m., Lane lured Delahunt to a trailer at the rear of the Kagen property, where Lane and Delahunt began kissing on a mattress. Anderson, who had previously placed a knife in the trailer, grabbed Delahunt and sliced his throat.

Anderson and Delahunt then began to struggle for control of the knife.

¶ 6 Lane left the trailer as Poyson entered and joined the struggle. Anderson eventually put the tip of the knife in Delahunt's ear and held him while Poyson pounded the knife until the tip emerged through Delahunt's nose. Poyson then beat Delahunt's head with a rock until he died.

¶ 7 After Delahunt was killed, Anderson, Lane, and Poyson went back to the Kagens' trailer home. Leta Kagen and Wear went to sleep several hours later, unaware of Delahunt's fate. Around midnight, Poyson grabbed a rifle that was kept in the trailer home. With Anderson carrying a lantern for light, Poyson and Anderson entered the bedroom where Kagen and Wear were sleeping. Poyson shot Kagen, killing her almost instantly. He fired again, hitting Wear in the jaw. Wear leapt out of bed and Poyson hit him over the head with the butt of the rifle. Anderson hit Wear with the lantern, which shattered. Wear ran outside, pursued by Anderson and Poyson. Anderson handed a cinder block to Poyson, who beat Wear over the head until he was dead.

¶ 8 After covering up Wear's body and stealing some items from the residence, Anderson, Lane, and Poyson left Golden Valley in Wear's pickup. With Anderson driving, the trio headed east on Interstate 40. Several days later, Anderson was stopped in Illinois while driving alone in Wear's truck. An Illinois state trooper ran the license plate number and found that the truck was connected with a multiple homicide in Arizona. Anderson was arrested. A search of the truck revealed a purse containing identification and credit cards belonging to Kagen and Wear.

¶ 9 After his arrest, Anderson was interrogated three times. Each interview was preceded by *Miranda* warnings; each time Anderson waived his rights.[1] Although Anderson initially denied any involvement in the Golden Valley murders, by the end of the third interview he had confessed to involvement in the crimes.

---

1. In *Anderson I,* we found the confessions voluntary. 197 Ariz. at 327 ¶ 35, 4 P.3d at 382. This appeal does not challenge the voluntariness of the confessions.

¶ 10 At trial, Anderson sought to minimize his participation in the homicides. He claimed that the murders and robbery were not premeditated and that he never intended for any of the victims to die. He admitted to slicing Delahunt's throat but claimed that he did so because he thought Delahunt was sexually assaulting Lane and because Delahunt bit Anderson when he intervened. Anderson testified that, after slicing Delahunt's throat, he watched Poyson beat Delahunt to death but did not participate or assist. He also claimed that he had no prior knowledge that Poyson was going to shoot Kagen or Wear and that he was simply an observer of those crimes. He testified that he felt threatened by Poyson and failed to intervene out of fear.

¶ 11 The jury unanimously found Anderson guilty on all counts. After the jury verdicts, but before sentencing, the United States Supreme Court decided *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (*Ring II*). The legislature then amended the capital sentencing statute and assigned to juries the responsibility of finding aggravating circumstances and determining whether a sentence of life imprisonment or death should be imposed. 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 3 (codified at A.R.S. § 13–703.01 (Supp.2003)).

¶ 12 Because the jury that found Anderson guilty was discharged after the verdict, a new jury was impanelled for the aggravation and penalty phases of the trial. In the aggravation phase, the jury unanimously found multiple aggravating factors with respect to each of the three murders.[2] During the penalty phase, the jury concluded that any mitigating factors were not sufficiently substantial to call for leniency. The superior court accordingly imposed three death sentences. Anderson was also sentenced to life imprisonment without the possibility of parole for twenty-five years for conspiracy to commit first-degree murder and to twelve and one-half years for armed robbery. The superior court ordered that the sentences for conspir-

acy and armed robbery run consecutively to the sentences for first-degree murder and to each other.

## II. Issues relating to the convictions

### A. The indictment

¶ 13 Anderson argues that the indictment counts charging armed robbery, conspiracy to commit murder, and first-degree murder were each duplicitous. An indictment is duplicitous if it charges more than one crime in the same count. *State v. Axley*, 132 Ariz. 383, 392, 646 P.2d 268, 277 (1982). Duplicitous indictments are prohibited because they fail to give adequate notice of the charge to be defended, present the potential of a non-unanimous jury verdict, and make a precise pleading of prior jeopardy impossible in the event of a later prosecution. *State v. Davis*, 206 Ariz. 377, 389 ¶ 54, 79 P.3d 64, 76 (2003).

¶ 14 The State contends that Anderson waived these arguments. We agree. Before his first trial, Anderson moved for a more specific indictment. The superior court denied the motion and Anderson challenged that denial in his first appeal. Given our disposition of the case on other grounds, we declined to address the issue, noting instead that "the case can be remanded for a new indictment or the indictment may be amended prior to Defendants new trial to avoid any confusion as to the charges that Defendant must meet." *Anderson I*, 197 Ariz. at 325 ¶ 29, 4 P.3d at 380.

¶ 15 Anderson did not renew his attack on the indictment before the second trial. Instead, he first raised the issue at the close of the State's case-in-chief in a motion for acquittal pursuant to Arizona Rule of Criminal Procedure 20. The superior court denied the motion, ruling that Anderson had waived the argument by not raising it prior to trial.

¶ 16 Arizona Rule of Criminal Procedure 13.5(e) provides that "[n]o issue con-

---

2. The jury found that the murders of Delahunt and Wear were motivated by pecuniary gain, A.R.S. § 13–703(F)(5), were especially cruel, heinous or depraved, *id.* § 13–703(F)(6), and were committed during the commission of another

homicide, *id.* § 13–703(F)(8). The jury found that the murder of Kagen was motivated by pecuniary gain and committed during the commission of another homicide.

cerning a defect in the charging document shall be raised other than by a motion filed in accordance with Rule 16." Rule 16.1(b) requires that such motions be filed at least twenty days before trial; Rule 16.1(c), in turn, provides that any motion not timely filed is "precluded."[3]

¶ 17 We require pretrial objections to an indictment in order to allow correction of any alleged defects before trial begins. If a defendant makes a timely objection, the State can remedy any duplicity by filing a new indictment charging multiple counts, thus exposing a defendant to multiple penalties. *See State v. Rushton,* 172 Ariz. 454, 456, 837 P.2d 1189, 1191 (App.2002). By failing to object before trial and later seeking dismissal of allegedly duplicitous counts, a defendant seeks to have his cake and eat it too: he avoids the potential of multiple punishments by depriving the State of the opportunity to amend, and then attempts to avoid any punishment at all. *See id.* ("While defendant risked, in the alternative, the possibility of a non-unanimous guilty verdict on the single charge as alleged, his failure to object to the indictment indicates a risk he was willing to take. Defendant simply gambled and lost and cannot now be heard to complain.").

¶ 18 Because the first appeal left the issue unresolved, Anderson was not relieved of the obligation to raise the objection anew after remand. *See United States v. Gomez,* 67

F.3d 1515, 1526 n. 13 (10th Cir.1995) ("[I]t is fundamental that, in cases where a new trial has been ordered, objections made during the first proceeding do not preserve issues for appeal in the second.") (citing *United States v. Hill,* 60 F.3d 672, 675 n. 2 (10th Cir.1995)); *Robison v. State,* 888 S.W.2d 473, 484–85 (Tex.Crim.App.1994) (holding that objection at first trial does not preserve error for appellate review of second trial).[4] By failing to object before the second trial, Anderson traded the risk of a non-unanimous jury for the reward of only one potential sentence on each of the challenged counts and therefore waived any objection.[5]

¶ 19 Even absent this waiver, Anderson's claims of a duplicitous indictment are unavailing. The three counts charging murder each listed a separate victim and thus were not duplicitous.[6] The same is true of the conspiracy count, which alleged a conspiracy to murder "other residents" at the Kagen address. As Anderson concedes, a single conspiracy count may allege multiple objects. *See* A.R.S. § 13–1003(C) (1989); *State v. Ortiz,* 131 Ariz. 195, 639 P.2d 1020 (1981), *disapproved on other grounds by State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983).

¶ 20 The armed robbery allegation was not duplicitous on its face. It alleged a single crime, namely that Anderson "committed armed robbery" at the Kagen residence on August 13, 1996. Anderson argues, how-

---

3. When the basis for a duplicity objection is not learned until trial, a prompt objection at that time is timely. *State v. Petrak,* 198 Ariz. 260, 267 ¶ 27, 8 P.3d 1174, 1181 (App.2000) (citing Ariz. R.Crim. P. 16.1(c)). Because Anderson raised the same attack on the indictments in his first appeal as he does here, he plainly learned of the basis for his objection before his second trial.

4. The State also contends that Anderson waived this argument by failing to stipulate to an amended indictment. We reject this contention. A defendant is not obligated to stipulate to a correction of a faulty indictment.

5. A duplicitous indictment also can be remedied by a jury instruction "particularizing the distinct offense charged in each count of the indictment." *State v. Axley,* 132 Ariz. 383, 392, 646 P.2d 268, 277 (1982) (quoting *United States v. Robinson,* 651 F.2d 1188, 1194 (6th Cir.1981)); *accord United States v. Ramirez–Martinez,* 273 F.3d 903, 915 (9th Cir.2001). Anderson proposed the jury

instructions and verdict forms for each of the challenged counts and thus invited any error. *See State v. Logan,* 200 Ariz. 564, 565 ¶ 8, 30 P.3d 631, 632 (2001) ("We have long held that when a party requests an erroneous instruction, any resulting error is invited and the party waives his right to challenge the instruction on appeal.").

6. Anderson also argues the murder convictions should be reversed because the jury may have been non-unanimous as to the victim of armed robbery, the predicate felony of the felony murder. But the jury rendered separate unanimous verdicts finding both felony murder and premeditated murder as to each victim, and this argument is thus moot. *See State v. Tucker,* 205 Ariz. 157, 167 ¶ 50, 68 P.3d 110, 120 (2003) (stating that felony murder and premeditated murder are simply two different forms of the single crime of first-degree murder).

ever, that the indictment's failure to specify any alleged victim or property taken created the possibility of a non-unanimous jury verdict because the State offered evidence at trial of robberies of different victims. Anderson contends that the jurors may not have unanimously agreed that Anderson committed armed robbery of any particular victim. This complaint is not really targeted at the indictment, but rather at the jury instructions and verdict forms that failed to expressly require jury unanimity as to any one victim. Because Anderson requested these jury instructions and verdict forms, he invited any error. *See State v. Logan,* 200 Ariz. 564, 565–66 ¶ 9, 30 P.3d 631, 632–33 (2001) (holding that we will not reverse a criminal conviction on the basis of error invited by the defendant, regardless of whether the error is fundamental).

### B. Jury selection

#### 1.

■ ¶ 21 When Anderson's second trial began, *Ring II* had not been decided, and the superior court operated from the assumption that jurors would not be involved in the sentencing process. Anderson argues that his convictions should be reversed because this assumption "skewed the decision making on whether to strike or remove various jurors for cause," and that some jurors' "death penalty scruples were mollified by the court's incorrect instruction that the jury would have no role in sentencing."

¶ 22 Anderson cites *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), in support of his argument. *Caldwell,* however, merely held that a death sentence could not stand "when the *sentencing* jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case." *Id.* at 323, 105 S.Ct. 2633 (emphasis added). As the Supreme Court subsequently noted, "*Caldwell* [is] 'relevant only to certain types of comments—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.' " *Romano v. Oklahoma,*

512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (quoting *Darden v. Wainwright,* 477 U.S. 168, 184 n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).

¶ 23 In this case, the judge did not mislead the guilt phase jurors regarding their role in sentencing. Under the law in effect at the time that the guilt phase jury was selected, jurors had no role in finding aggravating factors or recommending a sentence. And, because *Ring II* was not decided until after the guilt phase jury was discharged, that jury in fact played no part in sentencing. Thus, any comments by the judge during jury selection stating that these jurors would not be asked to decide whether a death sentence was warranted were accurate.

#### 2.

■ ¶ 24 Anderson argues that the trial judge committed several errors in determining which members of the venire were eligible to serve on the jury. First, he claims that potential juror R.B. was improperly excused for cause after indicating that his opposition to the death penalty would make it difficult for him to render a verdict based solely on the evidence. A trial judge's ruling on a challenge for cause is reviewed for abuse of discretion. *State v. Hickman,* 205 Ariz. 192, 201 ¶ 39, 68 P.3d 418, 427 (2003).

■ ¶ 25 The Sixth Amendment forbids excusing potential jurors for cause solely because of their general objections to the death penalty. *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Such general objections are "not sufficient to create a presumption that a prospective juror is unfit because of bias to sit on the panel." *Anderson I,* 197 Ariz. at 318 ¶ 6, 4 P.3d at 373. Potential jurors should be excluded, however, if their personal views prevent them from performing their duty as jurors. *Id.* at 318 ¶ 7, 4 P.3d at 373.

■ ¶ 26 To determine whether potential jurors who are opposed to the death penalty may nonetheless serve, the trial court must permit sufficient questioning to test the individuals' ability to set aside their personal beliefs and follow the judge's instructions. *Id.* at 318–19 ¶¶ 7–10, 4 P.3d at

373–74. Prospective jurors may be excused only if their beliefs would "prevent or substantially impair the performance of [their] duties as a juror in accordance with [their] instructions and [their] oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); *accord Anderson I,* 197 Ariz. at 318 ¶ 7, 4 P.3d at 373. Disqualification is, however, required of those who cannot be impartial because of their views of the death penalty. *State v. Martinez–Villareal,* 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985). A juror's bias need not be proved with "unmistakable clarity." *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844.

¶ 27 In this case, Anderson's trial counsel attempted to rehabilitate R.B. The juror gave equivocal responses but continued to express doubts about his ability to weigh the evidence objectively in a capital case. Defense counsel thus eventually agreed that R.B. met "the standard" requiring dismissal. The superior court did not abuse its discretion by excusing this potential juror for cause.

### 3.

¶ 28 Anderson argues that the superior court abused its discretion by denying four of his challenges for cause. A potential juror may be excused if "there is reasonable ground to believe [the] juror cannot render a fair and impartial verdict." Ariz. R.Crim. P. 18.4(b). Even a juror with preconceived notions about the defendant's guilt need not be excused if he or she agrees to decide the case based only on the evidence. *State v. Medina,* 193 Ariz. 504, 511 ¶ 19, 975 P.2d 94, 101 (1999).

¶ 29 Anderson claims that the superior court should have excluded two potential jurors, L.C. and J.W., who initially stated that they would give greater weight to the testimony of law enforcement officers. Yet, upon questioning by the court and the State, both gave satisfactory assurances that they could follow the judge's instructions regarding the determination of witnesses' credibility. The judge did not abuse his discretion by refusing to strike these two potential jurors. *See State v. Brierly,* 109 Ariz. 310, 320–21, 509 P.2d 203, 213–14 (1973). In any event, neither sat on Anderson's jury, so Anderson suffered no prejudice.[7] *See Hickman,* 205 Ariz. at 199–200 ¶ 32, 68 P.3d at 425–26 ("[A] trial court's error in failing to remove a juror for cause, and the defendant's subsequent use of a peremptory challenge to remove that juror, should be reviewed for harmless error.").

¶ 30 Anderson also argues that two potential jurors, R.S. and B.H., should have been excused because they were exposed to news reports about Anderson's first trial. However, mere exposure to pre-trial publicity or news reports does not automatically exclude a potential juror from serving. Those who can disregard pre-trial publicity and judge the case only on the evidence introduced in court need not be excluded. *Medina,* 193 Ariz. at 511 ¶ 19, 975 P.2d at 101. In this case, both potential jurors stated unequivocally that they could render a verdict based solely on the evidence presented at trial. The trial judge did not abuse his discretion by refusing to excuse them for cause. Moreover, neither R.S. nor B.H. served on Anderson's jury.

### C. Statements by non-testifying co-conspirators

¶ 31 Anderson argues that the trial court erred by admitting into evidence certain portions of the third interrogation, which was conducted by Detective Eric Cooper of the Mohave County Sheriff's Office. That interrogation occurred after Cooper had interviewed both Poyson and Lane, and Cooper used information obtained from the two co-conspirators when he questioned Anderson. At trial, defense counsel objected to the interrogation as inadmissible hearsay to the extent that it contained statements attributed by Cooper to Poyson or Lane. The

---

7. Anderson used a peremptory strike against L.C., but does not allege that any juror who sat on his jury was unfair or impartial. *See Hickman,* 205 Ariz. at 199 ¶ 31, 68 P.3d at 425 ("[W]hen a defendant secures an impartial jury, even through the curative use of a peremptory challenge, a conviction by that jury will not have prejudiced that defendant.").

superior court overruled the objection, finding that Anderson had adopted any such statements. Anderson argues that this ruling violated the rule of *Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), prohibiting the use of a non-testifying co-defendant's statements.

¶ 32 Because Lane testified at trial, Anderson has no valid *Bruton* objection to the use of her statements. *Nelson v. O'Neil,* 402 U.S. 622, 626–27, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). Therefore, the focus must be on any statements attributed by Cooper to Poyson during the interrogation.

¶ 33 The trial record identifies only one objection to a specific statement attributed to Poyson. On appeal, Anderson refers to the interrogation generally but fails to point to any specific statement that he contends was admitted in violation of *Bruton.* Anderson therefore has failed to preserve for our consideration any issues regarding the statements not specifically identified.[8]

¶ 34 In the one statement clearly objected to, Cooper stated, "Bobby and Kim both said this whole thing was premeditated." Anderson did not immediately respond to the statement. After a brief exchange, the following dialogue transpired:

> **COOPER:** Okay. But the three of you had talked about doing this, of killing Robert, Leta and Roland. As a matter of fact, Bobby wanted to kill Elliot, too, right? Remember him telling you that?
>
> **ANDERSON:** (Unintelligible) when they talked about it the . . . when Bobby talked about it the one, one day. I, I remember that now but it was more in a, I guess, maybe tryin' to feel you out, a kidding mood, you know. He says the only way you'll ever get outta here is by killin' 'em all. That's the only way you'll ever get. . . .

¶ 35 Later in the interrogation, Anderson stated that "[t]he only thing is on the set-up on the trailer is originally when this was all scheduled out, it was supposed to be after Roland got, uh, after Elliot got home because Elliot was supposed to have money."

Anderson also stated, "yeah, it was all premeditated."

¶ 36 An admission by a defendant is not hearsay. Ariz. R. Evid. 801(d)(2)(A). A statement by a third party offered against a defendant who has "manifested an adoption or belief in [the statement's] truth" is similarly not hearsay. *Id.* R. 801(d)(2)(B). Adoption occurs when a defendant affirmatively agrees to statements made in his presence, or expounds on the statements by adding his own "explanations and comments." *See State v. Daugherty,* 173 Ariz. 548, 550, 845 P.2d 474, 476 (App.1992). Because Anderson agreed with and expounded on the statement about premeditation attributed to Poyson, the superior court correctly found that Anderson adopted the statement.

### D. Admission of photographs

¶ 37 In his first appeal, Anderson challenged the admission of fourteen photographs. *Anderson I,* 197 Ariz. at 325–26 ¶ 30, 4 P.3d at 380–81. Because we reversed on other grounds, we declined to address this issue. We did, however, observe that some of the photographs were cumulative and some were "arguably overly prejudicial" because of their "*extremely* gruesome" nature and "slight probative value." *Id.* We suggested that the prosecution and trial judge "utilize suitable discretion to ensure that unnecessary and otherwise overly prejudicial photographs are not introduced on retrial." *Id.*

¶ 38 In this appeal, Anderson challenges the admission of nine photographs. Five were first admitted into evidence during the guilt phase and four during the aggravation phase.

¶ 39 A trial court's decision to admit a photograph is reviewed for abuse of discretion. *State v. Murray,* 184 Ariz. 9, 28, 906 P.2d 542, 561 (1995). Three factors go into the decision: (1) the photograph's relevance, (2) its "tendency to incite passion or inflame the jury," and (3) its "probative value versus potential to cause unfair prejudice." *Id.* Photographs may be relevant

---

**8.** Defense counsel apparently noted his specific objections on a copy of the interrogation transcript. However, that copy of the transcript was not included in the record.

to prove the corpus delecti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the states theory of how and why the homicide was committed.

*State v. Chapple,* 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983).

¶ 40 We begin from the premise that "any photograph of the deceased in any murder case [is relevant] because the fact and cause of death are always relevant in a murder prosecution." *State v. Spreitz,* 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997) (quoting *Chapple,* 135 Ariz. at 288, 660 P.2d at 1215). "There is nothing sanitary about murder, and there is nothing in Rule 403, Ariz. R. Evid., that requires a trial judge to make it so." *State v. Rienhardt,* 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997). Photographs must not be introduced, however, "for the sole purpose of inflaming the jury." *State v. Gerlaugh,* 134 Ariz. 164, 169, 654 P.2d 800, 805 (1982).

¶ 41 We have reviewed the photographs at issue and conclude that their admission was not improper. We acknowledge that several of the photographs are quite gruesome, showing human decomposition accelerated by high temperatures during the three days between the murders and the discovery of the victims' bodies. Several photos show bloating, skin slippage and discoloration in addition to the injuries inflicted by Anderson and Poyson. The photos were relevant, however, to corroborate the State's theory of the case and to prove its allegation that the murders were committed in an especially cruel or depraved manner.

¶ 42 The most disturbing photograph shows Delahunt's disfigured head with a knife inserted through the ear and emerging through the nose. But given the photograph's strong relevance in rebutting Anderson's claim that he did not participate in the killing of Delahunt, we do not find its probative value outweighed by its potential to cause unfair prejudice. The photograph illustrates an injury that a sole attacker would likely have had great difficulty inflicting on a struggling victim. The evidence was highly probative in refuting Anderson's trial testimony that he did not assist in the killing and in corroborating his statement to police that he helped Poyson pound the knife into Delahunt's ear.

¶ 43 We also find no abuse of discretion in the admission of the other contested photographs. We have examined each photograph and find that the probative value of each is not outweighed by any prejudicial effect. *See* Ariz. R. Evid. 403. Moreover, the record reveals that the superior court was mindful of our admonition in *Anderson I* to avoid unnecessary duplication of potentially disturbing photographs.

### E. Anderson's sexual relationship with Lane

¶ 44 Anderson argues that evidence of his sexual relationship with Lane, who was fourteen years old at the time of the crimes, "poisoned [the] proceedings from the outset, was extremely prejudicial and irrelevant and should have been kept out of trial entirely." Anderson concedes, however, that his own counsel elicited evidence of Anderson's sexual relationship with Lane during the testimony of both Anderson and Lane.[9] Any error was thus plainly invited. *See Logan,* 200 Ariz. at 565 ¶ 8, 30 P.3d at 632.

### F. Alleged prosecutorial misconduct

¶ 45 Anderson alleges that the prosecutor engaged in misconduct through "improper statements" made during the three phases of the trial. We "will reverse [a] defendant's conviction because of prosecutorial misconduct if two conditions are satisfied: (1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Atwood,* 171 Ariz. 576, 606,

9. Anderson also claims ineffective assistance of counsel with respect to his lawyer's handling of this issue at trial. As Anderson concedes, however, such claims are not properly raised on direct appeal, but rather in a petition for post-conviction relief. *State v. Spreitz,* 202 Ariz. 1, 3 ¶ 9, 39 P.3d 525, 527 (2002).

832 P.2d 593, 623 (1992), *disapproved on other grounds by State v. Nordstrom,* 200 Ariz. 229, 241 ¶ 25, 25 P.3d 717, 729 (2001); *accord State v. Hughes,* 193 Ariz. 72, 79 ¶ 26, 969 P.2d 1184, 1191 (1998). Because Anderson did not object to any of the prosecutor's comments, we review only for fundamental error. *See State v. Thomas,* 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981).

### 1.

¶ 46 Anderson claims that several remarks in the prosecutor's opening statement were misconduct. None of these statements, however, was improper. The State told the jury that the evidence it would see was horrible, and indeed it was. The State told the jury the murders were savage, and at least two of them indisputably were. The State characterized Anderson's interrogations as "nonsensical" and indicated that Anderson's conflicting stories suggested he was lying. In fact, Anderson's statements were both incoherent and internally inconsistent. Finally, the State indicated it would not use "fancy forensics" because Anderson's confessions and Lane's statements rendered such evidence unnecessary. In fact, the State did not present substantial forensic evidence.

### 2.

¶ 47 Anderson also alleges prosecutorial misconduct on the basis of twelve statements made during the aggravation and penalty phases. Anderson provides no explanation as to what was allegedly improper about each statement.

**10.** These ten statements were:

·1. "You don't have to use your own personal yard stick of what the death penalty should be imposed for. The law is pretty specific. The law has a step-by-step process that we'll explain to you as we go."

2. "And when you hear the aggravating factors and work through this process with us, you will find that the law does require the imposition of the death penalty for this defendant."

3. "We're here ... to determine what the lawfully required punishment is ...."

4. The prosecutor suggested that jurors could reject proffered mitigation based on Anderson's childhood if they didn't think it relevant.

5. "[Y]ou'll find the defendant will be required by law to receive the death penalty."

6. "[T]he law requires the death penalty in these kind of cases."

¶ 48 Ten of the twelve challenged statements do not merit extended discussion; they were either substantially accurate statements or fair argument about the facts, and in any event do not come close to constituting fundamental error.[10] Two other statements, however, require more analysis.

#### a.

¶ 49 The prosecutor told the jury that the pecuniary gain aggravating factor, A.R.S. § 13–703(F)(5) (Supp.2003), was established by Anderson's conviction for armed robbery, stating, "that's, by the way, pretty much—it's already proven. The armed robbery conviction ... proves this .... Pecuniary gain was proved by the armed robbery conviction last year." This was a misstatement of the law. Armed robbery and pecuniary gain have separate and distinct elements:

> To prove robbery, the state must show a *taking* of property from the victim, *see* A.R.S. § 13–1902(A); to prove pecuniary gain, the state must show the actor's *motivation* was the expectation of pecuniary gain, *see* A.R.S. § 13–703(F)(5). Proving a taking in a robbery does not necessarily prove the motivation for a murder ....

*State v. Greenway,* 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991) (quoting *State v. Carriger,* 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984)).

¶ 50 However, the superior court properly instructed the jury on this aggravating factor:

> 7. "What the law says is if a person [is] convicted of first-degree murder and aggravating factors are present, that defendant should receive a death sentence. We're to that stage. The burden is then on the defendant to prove by a preponderance of the evidence that there's sufficient mitigation to outweigh the law that says the death penalty should be imposed, and that's where we are."

8. The State demanded that an expert witness who testified during the penalty phase make a "connection" between childhood "disability developments" and adult conduct.

9. The State argued that another expert never proved a "link" between childhood trauma and crimes.

10. The court instructed the jury not to be swayed by mere sympathy or sentiment. *See infra* ¶ 92 (finding no error in this instruction).

The pecuniary gain aggravating circumstance only applies if you find beyond a reasonable doubt that the defendant committed the offense as consideration for the receipt or in expectation of the receipt of anything of pecuniary value.

In order to prove this factor, the State must prove that the expectation of pecuniary gain was a motive, cause, or impetus for murder and not merely the result of it. A finding of pecuniary gain may be based on tangible evidence or strong circumstantial evidence. While pecuniary gain need not be the exclusive cause of the murder, you may not find that the pecuniary gain aggravating circumstance exists merely because the person was killed and at the same time the defendant made a financial gain.

The court also instructed the jury that "[t]he law that applies to this hearing is stated in these instructions" and that "[i]n their opening statements and closing arguments the lawyers have talked to you about the law and the evidence. What the lawyers said is not evidence, but it may help you understand the law and the evidence." Given these instructions, the prosecutor's argument was not fundamental error.

#### b.

¶ 51 The prosecutor also argued that the multiple homicides aggravating factor, A.R.S. § 13–703(F)(8), was established by the three first-degree murder verdicts. Again, the statement was inaccurate. To establish this aggravating factor, the State must prove not only that the defendant committed multiple homicides, but also that the murders occurred during "a continuous course of criminal conduct." *State v. Tucker*, 205 Ariz. 157, 169 ¶ 65, 68 P.3d 110, 122 (2003) (quoting *State v. Rogovich*, 188 Ariz. 38, 45, 932 P.2d 794, 801 (1997)).

¶ 52 However, the trial court also properly instructed the jury as to this factor:

The one or more homicides aggravating circumstance only applies if you find beyond a reasonable doubt that the defendant committed either: One, first degree murder; two, second-degree murder; three, manslaughter; or four, negligent homicide, and that these offenses were committed during the commission of the offense upon which the defendant is being sentenced.

In order to find that this aggravating circumstance applies, you must find that the other murder or murders was committed during a continuous course of criminal conduct.

In light of this instruction, and the superior court's admonition that statements by lawyers were not evidence, the prosecutor's misstatement of the law did not constitute fundamental error.

### G. Sufficiency of evidence of armed robbery

¶ 53 Anderson argues that there was insufficient evidence to support his armed robbery conviction. Acquittal is required "if there is no substantial evidence to warrant a conviction." Ariz. R.Crim. P. 20(a); *State v. Lee*, 189 Ariz. 608, 615, 944 P.2d 1222, 1229 (1997).

¶ 54 A robbery occurs when, "[i]n the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property." A.R.S. § 13–1902(A) (1989). An armed robbery occurs when, during a robbery, the defendant or an accomplice is armed with, uses, or threatens to use a deadly weapon. A.R.S. § 13–1904(A) (1989). A defendant need not personally use or threaten to use the deadly weapon if an accomplice does so. *Id.; State v. McNair*, 141 Ariz. 475, 479, 687 P.2d 1230, 1234 (1984).

¶ 55 Anderson contends that the State failed to prove that force was used to effectuate a taking. He claims the evidence shows at most that force was used at some point and that a taking later occurred. This Court has held that "[w]hen the use of force and the taking of property are not contemporaneous ... there is not a robbery." *State v. Comer*, 165 Ariz. 413, 420, 799 P.2d 333, 340 (1990) (quoting *State v. Lopez*, 158 Ariz. 258, 264, 762 P.2d 545, 551 (1988)). "However, a

robbery may also be established when the use of force precedes the actual taking of property, so long as the use of force is accompanied with the intent to take another's property." *Id.* at 421, 799 P.2d at 341. If the intent to commit robbery coexists with the use of force, there is a robbery. *Id.* at 420, 799 P.2d at 340.

¶ 56 Anderson also challenged the sufficiency of the evidence of armed robbery in his first appeal. *Anderson I*, 197 Ariz. at 324 ¶ 25, 4 P.3d at 379. We determined that "[f]rom the evidence presented at trial, a reasonable juror could certainly conclude that [Anderson] and Poyson planned to steal the truck and some money before the murders were committed." *Id.* at 325 ¶ 28, 4 P.3d at 380. We therefore remanded the armed robbery charge for retrial. *Id.*

¶ 57 Anderson now raises precisely the same argument he did in the previous appeal: he claims the State provided no evidence of intent to steal *while* using force, as distinguished from a decision to steal made after the victims were dead. We once again reject the argument. Substantial evidence was presented at the retrial that Anderson killed Wear to steal his pickup and killed Delahunt and Kagen in an effort to avoid getting caught.[11] Both Anderson and Lane admitted plans to steal the truck. Anderson admitted searching Wear's body for the pickup keys immediately after Wear was killed.

¶ 58 We found in *Anderson I* that similar evidence supported the conclusion that "the murders were premeditated and taking Wear's truck was the object to be gained." 197 Ariz. at 325 ¶ 28, 4 P.3d at 380. No different conclusion can be reached here. If anything, the evidence at Anderson's second trial was stronger because Lane testified at the second trial but not the first. As we noted in *Anderson I*, while a jury could conceivably have concluded that Anderson's intent to take the victims' property arose only after each victim was dead, the evidence

is more than sufficient to support a contrary conclusion. *Id.* at 325 ¶ 28, 4 P.3d at 380.

### H. The felony murder verdicts

¶ 59 Anderson argues that the felony murder verdicts must be vacated because there was insufficient evidence to support the alleged predicate felony of armed robbery. Our conclusion that substantial evidence supports the armed robbery conviction dooms this argument. In any event, the jury returned separate guilty verdicts for both felony murder and premeditated murder as to each victim; therefore, the first-degree murder convictions would stand even absent a felony murder predicate. *See State v. Tucker*, 205 Ariz. 157, 167 ¶ 50, 68 P.3d 110, 120 (2003) ("That felony murder and premeditated murder contain different elements does not make them different crimes, rather they are simply two forms of first degree murder.").

### I. Rejection of Anderson's proposed jury instructions

¶ 60 Anderson contends that the trial court erred by rejecting several of his requested jury instructions. A defendant is "entitled to an instruction on any theory reasonably supported by evidence." *State v. LaGrand*, 152 Ariz. 483, 487, 733 P.2d 1066, 1070 (1987). A trial court's refusal to give a jury instruction is reviewed for abuse of discretion. *State v. Bolton*, 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995).

#### 1.

¶ 61 Anderson requested a justification instruction because he claimed to have attacked Delahunt to stop a sexual assault on Lane. "A person is justified in ... using ... deadly physical force against another if and to the extent the person reasonably believes that ... deadly physical force is immediately necessary to prevent the other's commission of ... sexual assault...." A.R.S. § 13–411(A) (1989). A defendant is entitled

---

11. Anderson claims that the sole evidence showing his robbery motive for killing the victims came from inadmissible statements of his co-conspirators. We have rejected the argument that statements were wrongly admitted. *See su-* *pra* ¶¶ 31–36. In any event, Anderson's confessions and Lane's trial testimony provide additional evidence to support the armed robbery conviction.

to a justification instruction if there is evidence of justification for the defensive act. *State v. Taylor*, 169 Ariz. 121, 124, 817 P.2d 488, 491 (1991).

¶ 62 There was, however, no evidence at trial that the murder of Delahunt, as opposed to Anderson's initial confrontation with the victim, was committed to prevent a sexual assault on Lane. Anderson testified that he heard Lane scream for help, pulled Delahunt off of Lane, and then began to struggle with the boy, who bit Anderson's hand. At that point, Anderson cut Delahunt's throat and instructed Lane to go get help. Once Lane exited the trailer, any threat of sexual assault had ended. Delahunt did not die from the slicing of his throat, but from massive head trauma subsequently inflicted by Poyson and Anderson in an attack that continued long after the claimed sexual assault was terminated. The trial judge therefore did not abuse his discretion by refusing to give a justification instruction.

### 2.

■ ¶ 63 Anderson next argues that the denial of an aggravated assault instruction deprived him of due process under the rule of *Beck v. Alabama*, 447 U.S. 625, 638, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). *Beck* held unconstitutional an Alabama statute that prohibited a trial court from instructing the jury on any lesser included offense in a capital murder prosecution. The Supreme Court found that such a restriction might lead a jury to convict a defendant of capital murder, despite jurors' reasonable doubts, merely because the jurors thought the defendant was guilty of some crime and should therefore be punished. *Id.* at 642–43, 100 S.Ct. 2382.

¶ 64 The Supreme Court's subsequent opinion in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), shows that *Beck* is of no avail to Anderson. In *Schad*, the defendant argued that "the due process principles underlying *Beck* require that the jury in a capital case be instructed on every lesser included noncapital offense supported by the evidence." *Id.* at 646, 100 S.Ct. 2382. The Court disagreed, noting that its concern in *Beck* was the statute's "all-or-nothing" nature. *Id.* Because the jury in

*Schad* was given the option to convict the defendant of a lesser offense, second-degree murder, and rejected that option, the Supreme Court held that the trial court's refusal to instruct on robbery did not implicate the *Beck* rule. *Id.* at 647–48, 100 S.Ct. 2382.

¶ 65 In this case, the superior court refused Anderson's request for an aggravated assault instruction, but did instruct the jury on second-degree murder and manslaughter. Because the jury had the option of these immediately-lesser included offenses, but nonetheless found the defendant guilty of the highest offense, it "necessarily rejected all other lesser-included offenses." *State v. Vickers*, 159 Ariz. 532, 542, 768 P.2d 1177, 1187 (1989) (quoting *State v. White*, 144 Ariz. 245, 247, 697 P.2d 328, 330 (1985)).

### 3.

■ ¶ 66 Anderson contends that the "reasonable doubt" instruction was erroneous. Because he requested the very instruction to which he now objects, he invited any error and waived this argument. *Logan*, 200 Ariz. at 565 ¶ 8, 30 P.3d at 632. In any event, the instruction followed the language recommended in *State v. Portillo*, 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995), and approved repeatedly by this Court. *See, e.g., State v. Lamar*, 205 Ariz. 431, 441 ¶ 49, 72 P.3d 831, 841 (2003); *State v. Cañez*, 202 Ariz. 133, 156 ¶¶ 75–76, 42 P.3d 564, 587 (2002).

### 4.

■ ¶ 67 Anderson argues that the instruction defining premeditation lowered the State's burden of proof on an element of the offense of first-degree murder. The instruction provided that premeditation can be "as instantaneous as successive thoughts in the mind." We disapproved this language in *State v. Thompson*, 204 Ariz. 471, 479–80 ¶ 32, 65 P.3d 420, 428–29 (2003), and in *State v. Dann*, 205 Ariz. 557, 565 ¶ 16 & n. 2, 74 P.3d 231, 239 & n. 2 (2003). However, because Anderson requested the instruction to which he now objects, he invited any error. *Logan*, 200 Ariz. at 565 ¶ 8, 30 P.3d at 632.

### J. *Enmund–Tison* findings

¶ 68 Anderson argues that he was entitled to *Enmund–Tison* findings before sentencing on his felony murder convictions. A defendant cannot be sentenced to death for felony murder unless he personally killed, attempted to kill, or intended that lethal force be employed, *Enmund v. Florida*, 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), or was a major participant in the underlying felony and acted with reckless indifference to human life, *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In this case, the jury returned separate unanimous verdicts finding Anderson guilty of both first-degree premeditated murder and first-degree felony murder as to each victim. In order to return a guilty verdict for first-degree premeditated murder, a jury must conclude that the defendant intended to kill the victim. A.R.S. § 13–1105(A)(1) (Supp.1996). Given the three premeditated murder verdicts, no further *Enmund/Tison* finding was necessary. *State v. Styers*, 177 Ariz. 104, 114, 865 P.2d 765, 775 (1993).

### K. Conspiracy to commit first-degree murder

¶ 69 The verdict form did not indicate whether the jury found Anderson guilty of conspiracy to commit premeditated murder or conspiracy to commit felony murder. Anderson argues that, given the wording of the jury instruction on conspiracy, it is possible that one or more jurors found him guilty of conspiracy to commit first-degree murder despite finding that Anderson had only the requisite intent to commit felony murder.

¶ 70 In *Evanchyk v. Stewart*, 202 Ariz. 476, 47 P.3d 1114 (2002) (*"Evanchyk I"*), we addressed the following certified question in a federal habeas corpus case:

[W]hether one can be convicted of conspiracy to commit first-degree murder when the state does not prove that the killing was committed with premeditation but only that it occurred in the course and furtherance of committing one of the underlying felonies listed in A.R.S. § 13–1105(A)(2) [the felony murder statute].

*Id.* at 479 ¶ 11, 47 P.3d at 1117. We held that because "conspiracy to commit first-degree murder is a specific intent crime ... the state must prove as elements that the defendant intended to kill and entered into an agreement with a coconspirator to commit the crime of murder." *Id.* at 480–81 ¶ 16, 47 P.3d at 1118–19.

¶ 71 After we answered the certified question, the federal district court granted the writ of habeas corpus and the Ninth Circuit affirmed in *Evanchyk v. Stewart*, 340 F.3d 933 (9th Cir.2003) (*"Evanchyk II"*). The Ninth Circuit held that the jury instruction on conspiracy to commit first-degree murder was deficient because it omitted the element of intent to kill. *Id.* at 939–40. The Ninth Circuit found the error not harmless because it could not conclude that a properly instructed jury would have found that element. *Id.* at 941–92.[12]

¶ 72 In this case, the jury was instructed that in order to convict Anderson of conspiracy to commit first-degree murder, it must find:

That the defendant agreed with one or more persons that one of them or another person would engage in certain conduct; and that defendant intended to promote or assist the commission of such conduct; and that the intended conduct would constitute the crime of first degree murder of other residents at 2725 Yavapai Drive.

This instruction was not materially different from the instruction in *Evanchyk II. See id.* at 936–37. Because the "intended conduct" that could "constitute the crime of first degree murder" could technically be conduct sufficient to support a finding of only felony murder, Anderson argues that the instruction omitted the essential element of intent to kill. Because Anderson did not object to the jury instruction, we review only for fundamental error. *See State v. Davis*, 206 Ariz. 377, 390 ¶ 62, 79 P.3d 64, 77 (2003).

---

12. The Ninth Circuit affirmed the district court's grant of the writ subject to the State's ability to retry Evanchyk, noting that there was "substantial evidence of an agreement to kill." *Evanchyk II*, 340 F.3d at 942.

¶ 73 For the reasons specified in our opinion in *Evanchyk I*, the jury should have been instructed that intent to kill is an element of conspiracy to commit first-degree murder. But here, unlike in *Evanchyk II*, the error was harmless. In contrast to the *Evanchyk II* jury, which acquitted the defendant of first-degree murder and thus made no finding with respect to the defendant's intent to kill, 340 F.3d at 935, the jury here unanimously found Anderson guilty of three counts of *premeditated* first-degree murder. To reach those verdicts, the jury necessarily concluded that Anderson intended to kill each of the victims. *See* A.R.S. § 13–1105(A) ("A person commits first degree murder if . . . [i]ntending or knowing that the person's conduct will cause death, the person causes the death of another with premeditation.").

### III. Sentencing issues

#### A. Ex post facto claims

¶ 74 Anderson argues the application of Arizona's new death penalty statute, which was enacted after the commission of his crimes, is forbidden by the Ex Post Facto Clauses of the state and federal constitutions, Ariz. Const. art. 2, § 25 and U.S. Const. art. I, § 10, cl. 1, the Double Jeopardy Clauses of the state and federal constitutions, Ariz. Const. art. 2, § 10 and U.S. Const. amend. V, and A.R.S. § 1–244 (2001), the statutory prohibition against retroactive application of statutes. We have recently considered and rejected these arguments in *State v. Ring*, 204 Ariz. 534, 547 ¶¶ 15–42, 65 P.3d 915, 928 (2003) ("*Ring III*"), and *State v. Carreon*, 210 Ariz. 54, 60–61 ¶¶ 17–22, 107 P.3d 900, 906–07 (2005), and therefore need not discuss them here.

#### B. Due process retroactivity claim

¶ 75 Anderson claims that he was denied due process by application of a death penalty statute enacted after his guilt trial. This argument was presented and implicitly rejected in *Ring III*, which concluded that the statutory change was procedural, not substantive, and did not deprive the defendant of substantial protections provided by the prior law. 204 Ariz. at 545–47 ¶¶ 15–24, 65 P.3d at 926–28 (discussing double jeopardy claims).

#### C. Burden on defendant under death penalty statute

¶ 76 Anderson argues that Arizona's death penalty statute creates an unconstitutional "presumption of death" because it requires a jury to impose a death sentence if it unanimously finds one or more aggravating circumstances and then determines that "there are no mitigating circumstances sufficiently substantial to call for leniency." *See* A.R.S. § 13–703(E), (H). Anderson also contends that requiring a defendant to prove mitigating circumstances violatès the Eighth Amendment.

¶ 77 This Court has already squarely rejected Anderson's "presumption" argument. *Hoskins*, 199 Ariz. at 146 ¶ 82, 14 P.3d at 1016 (citing *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992)). We have also held that it is constitutional to place the burden of proving mitigation on the defendant, *State v. Watson*, 120 Ariz. 441, 447, 586 P.2d 1253, 1259 (1978), a position endorsed by the United States Supreme Court, *Walton v. Arizona*, 497 U.S. 639, 649–51, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled on other grounds by Ring II*, 536 U.S. at 608–09, 122 S.Ct. 2428. While Anderson argues that *Ring II* changed the law in this regard, we have also rejected that very contention. *State v. Rutledge*, 205 Ariz. 7, 15 ¶ 42, 66 P.3d 50, 58 (2003).

#### D. Failure to indict Anderson for a capital crime

¶ 78 Anderson asserts that the Indictment Clause of the Arizona Constitution, Ariz. Const. art. 2, § 30, forbids his conviction for capital murder because his indictment did not allege aggravating circumstances. This Court has twice recently rejected that argument. *Carreon*, 210 Ariz. at 61 ¶ 25, 107 P.3d at 907; *McKaney v. Foreman*, 209 Ariz. 268, 273 ¶ 23, 100 P.3d 18, 23 (2004). Moreover, the jury findings of aggravators beyond a reasonable doubt "demonstrate[ ] *a fortiori* that there was probable cause to charge [the defendant] with the offenses for which [he was] convicted." *United States v. Mechanik*, 475

U.S. 66, 67, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986).

### E. Absence of pretrial notice of aggravating factors

 ¶ 79 After his original conviction, Anderson was given notice of alleged aggravating factors on January 27, 1998. Following his second conviction on October 9, 2001, the prosecution filed another notice of aggravating factors on October 16, 2001, listing precisely the same factors alleged in 1998. The State thus complied with the rule in effect at the time of both trials, which required notice of aggravating factors no later than ten days after a guilty verdict. Ariz. R.Crim. P. 15.1(g)(2)(1998).[13]

¶ 80 Anderson complains that the notice given after his second conviction violated the Sixth, Eighth and Fourteenth Amendments of the United States Constitution by leaving him insufficient time to prepare a defense. However, because of the intervening decision in *Ring II*, the second aggravation trial did not commence until November 13, 2002. Anderson thus received the second notice of aggravating factors more than one year before the relevant aggravation phase commenced. Moreover, because the second notice was identical to the first, Anderson had notice of the alleged aggravating factors more than three years prior to the start of the aggravation phase of the second trial. Anderson's due process arguments therefore fail.

### F. Separate juries for guilt and aggravation/penalty phases

 ¶ 81 Anderson argues that he was constitutionally entitled to have the aggrava-

tion and penalty issues decided by the same jury that decided guilt. However, *Ring III* rejected that argument, holding that "a defendant holds no absolute right to" a penalty "trial with the same judge or jurors" who heard the evidence on guilt, and reasoning that the ability to re-sentence capital defendants by a new jury is implicit in the Supreme Court's death penalty jurisprudence. 204 Ariz. at 551 ¶¶ 39–40, 65 P.3d at 932.[14]

¶ 82 Anderson next argues that because A.R.S. § 13-703.01(E) allows the aggravation phase jury to consider evidence presented at the guilt phase, the statute precludes the impaneling of a new jury. But the burden of proof at the aggravation phase is on the State. *See* A.R.S. § 13-703(B). Therefore, when a new jury is convened for the aggravation phase, the State must present to that jury—as it did in this case—any trial evidence it wishes considered in determining aggravation. Anderson suffered no prejudice from this procedure.

¶ 83 Anderson further argues that because the jury at the penalty phase may consider any mitigation evidence presented during the guilt phase, A.R.S. § 13-703.01(I), a different jury cannot sit in the penalty phase. But § 13-703.01(I) applies on its face only when the penalty jury is the same jury that determined guilt. Moreover, Anderson does not suggest that he was prevented from presenting to the penalty phase jury any mitigation evidence that was introduced at the guilt phase. Nor does he identify any mitigation evidence that the penalty phase jury failed to hear.

¶ 84 Anderson also argues that the penalty phase jurors had the issue of guilt "thrust

---

**13.** Under our current rules, such notice must be given no later than sixty days after arraignment. Ariz. R.Crim. P. 15.1(i)(1)-(2). This rule, however, applies only to cases in which the charging document was filed on or after December 1, 2003, or in which an appellate court mandate ordering a new trial is served on or after that date. Ariz. R.Crim. P. 15, Prefatory Comment.

**14.** The California Supreme Court has also held that re-sentencing by a newly convened jury in a death penalty case is not unconstitutional. *People v. Davenport*, 11 Cal.4th 1171, 47 Cal.Rptr.2d 800, 906 P.2d 1068, 1079–80 (1995), *abrogated on other grounds by People v. Griffin*, 33 Cal.4th

536, 15 Cal.Rptr.3d 743, 93 P.3d 344 (2004). The same principle is implicit in numerous decisions remanding for re-sentencing by a new jury after a defendant's original death sentence has been vacated. *See, e.g., Carruthers v. State*, 272 Ga. 306, 528 S.E.2d 217 (2000); *People v. Williams*, 193 Ill.2d 1, 249 Ill.Dec. 840, 737 N.E.2d 230 (2000); *State v. Hale*, 335 Or. 612, 75 P.3d 448 (2003). *See also State ex rel. Neely v. Sherrill*, 168 Ariz. 469, 815 P.2d 396 (1991) (holding that neither federal nor state constitution prohibits use of a second jury to try a prior-conviction allegation when defendant absconds before or during criminal trial).

upon them" in violation of his Eighth Amendment right to an individualized sentencing determination. He asserts that the issues of guilt and punishment are too interwoven to be bifurcated and tried to different juries, in particular because guilt phase jurors may have "residual doubt" that makes them less likely to sentence a defendant to death. *See Lockhart v. McCree*, 476 U.S. 162, 181, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ("[T]he fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.") (citation omitted).

¶ 85 The fact that Anderson had different juries for the guilt and aggravation/penalty phases, however, did not deprive him of an individualized sentencing determination. Anderson does not argue that he was prevented from presenting any mitigation evidence. Indeed, the aggravation and penalty phases were essentially a full-blown re-presentation of the entire case. Nearly every trial exhibit was admitted, and the only trial witnesses who did not testify at the sentencing hearings were the two Illinois state troopers who arrested Anderson. As to those witnesses, nothing prevented Anderson from offering their guilt phase testimony had he found it helpful to his case.

¶ 86 In response to Anderson's complaint that the second jury was not allowed to revisit the issue of guilt or innocence, we note that the same result occurs when a single jury sits for the guilt and sentencing phases of a capital trial. During the aggravation and penalty phases, a jury may not revisit its initial guilty verdict. The only issue at the aggravation phase is whether any aggravating circumstances have been proved; the only issue during the penalty phase is whether death is the appropriate sentence. A.R.S. § 13–703.01(E), (H).[15]

## G. Double jeopardy limits on using a new jury for sentencing

¶ 87 Anderson contends that convening a second jury for sentencing after dismissal of his original jury impermissibly increased the punishment he faced, in violation of the double jeopardy protections of the state and federal constitutions. *Ring III* squarely rejects these arguments, holding that use of a second jury during the aggravation and penalty phases does not constitute double jeopardy. 204 Ariz. at 547–48 ¶ 25, 65 P.3d at 928–29. Although Anderson had not been sentenced to death (on retrial) when *Ring II* was decided, he is for all relevant purposes situated identically to the *Ring III* defendants. Each of those defendants, like Anderson, had guilt adjudicated by one jury and is subject to re-sentencing by a different jury.

## H. Selection of the aggravation/penalty jury

¶ 88 Anderson argues that the superior court erred by excusing two prospective aggravation/penalty phase jurors, L.M. and R.W., for cause solely because each expressed general scruples about the death penalty. He argues that the trial court was obligated to question further and determine whether these potential jurors could follow the judge's instructions despite their views on capital punishment. We conclude, however, that the trial court did not abuse its discretion in dismissing these potential jurors.

¶ 89 One of the two prospective jurors, L.M., gave conflicting answers but, through extended questioning, continued to express doubts about her ability to render an impartial verdict for sentencing in a death penalty case. The court excused her because she expressed uncertainty whether her beliefs would "substantially impair her from being

---

15. Subsections (J) and (K) of A.R.S. § 13–703.01 provide that if a jury is unable to reach a verdict at either the aggravation phase or the penalty phase, a new jury will be impanelled, and the new jury "shall not retry the issue of the defendant's guilt." These statutes do not cover the circumstance presented by this case, where the first aggravation/penalty jury is different from the guilt phase jury. However, by limiting the issues before the aggravation and penalty juries, § 13–703.01(E) compels a similar result in this situation.

able to follow her instructions and her oath." The other prospective juror, R.W., stated categorically that he "would never vote for a death penalty in any case." Defense counsel neither questioned further thereafter nor objected to the dismissal of R.W.

■■■ ¶ 90 Anderson also contends that the trial judge erred by refusing to strike for cause six prospective jurors, none of whom ultimately served on the aggravation/penalty jury. One of the six, J.F., initially indicated that he would give more weight to the testimony of law enforcement officers, but later agreed that he could follow the court's instructions and apply the same credibility standard to all witnesses.[16] Another, L.M., indicated at first that she could not impose a life prison sentence, but later stated that she would do so if warranted by the evidence. Three other prospective jurors, D.E., S.F., and P.M., all indicated strong support for the death penalty; upon questioning, however, each stated that she would render a verdict only in accordance with the evidence and instructions from the court. A sixth prospective juror, D.W., said she had read media accounts of the case, in violation of a court order. She said, however, that she read only the headline of a story concerning the case and not the text. The trial court did not abuse its discretion by refusing to excuse these six jurors for cause.

## I. Jury instruction defining aggravating factors

¶ 91 Anderson argues that the trial court's instruction to the jury that "[a]ggravating factors are those which increase the guilt or enormity of the offense" constituted fundamental error. We rejected this argument in *Carreon,* 210 Ariz. at 71–72 ¶¶ 88–89, 107 P.3d at 917–18.

## J. Jury instruction regarding "sympathy or sentiment"

¶ 92 At the close of both the aggravation and penalty phase hearings, the trial court instructed the jury that it should not be "swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." Anderson contends that these instructions violated the Eighth Amendment of the United States Constitution by limiting the mitigation evidence the jurors could consider. We rejected this argument in *Carreon,* 210 Ariz. at 70–71 ¶¶ 81–87, 107 P.3d at 916–17.

## K. Requirement of "causal nexus" for mitigation

¶ 93 Anderson argues that "[i]nstructing the jury to disregard mitigating evidence where it is not shown to *cause* the defendant's conduct at the time of the crime violated" the Eighth Amendment of the United States Constitution. The Supreme Court has emphasized that "a State cannot preclude the sentencer from considering any relevant mitigating evidence that the defendant proffers in support of a sentence less than death," *Payne v. Tennessee,* 501 U.S. 808, 822, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (internal quotation marks omitted), and that "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce." *Id.* The Court also recently held that a jury cannot be prevented from giving effect to mitigating evidence solely because the evidence has no causal "nexus" to a defendant's crimes. *Tennard v. Dretke,* 542 U.S. 274, ——-——, 124 S.Ct. 2562, 2569–72, 159 L.Ed.2d 384 (2004).

¶ 94 The "instruction" to which Anderson objects, however, was never given in this case. The jury was not told that it had to find a "nexus" between the proffered mitigation evidence and Anderson's crime. Rather, the superior court simply instructed the jurors that they should consider any mitigation they found "relevant in determining whether to impose a sentence less than death." Anderson did not object to this instruction, which was in any event entirely proper. *See Eddings,* 455 U.S. at 113–14, 102 S.Ct. 869 (holding that sentencer should consider any "relevant mitigating evidence").

¶ 95 Anderson also objects to various questions and comments made by the prosecution about his proffered mitigation evidence. Because Anderson did not object to any of these

---

16. J.F. was chosen as an alternate but did not participate in deliberations.

comments or questions, we review only for fundamental error. *State v. Gendron*, 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991).

¶ 96 First, Anderson complains that during cross-examination of Anderson's mitigation expert the prosecution questioned the expert's lack of formal education "to make any connection between upbringing and adult conduct." The prosecutor then emphasized that the expert's testimony was merely her personal "opinion as to what happened in childhood, that affects adult behavior." Anderson also objects to the State's closing argument, during which the prosecutor emphasized that a psychologist called by the defense to offer mitigation evidence "didn't testify about any links, any connections between the defendant's upbringing and him murdering people. Nothing in his childhood caused that." Finally, Anderson points out that the prosecution, during its penalty phase opening statement, told the jury that it would have to decide whether any mitigation evidence was relevant.

¶ 97 None of these statements was improper. While *Eddings* and various other Supreme Court decisions dictate a liberal rule of *admissibility* for mitigating evidence, they still leave it to the sentencer to "determine the weight to be given to relevant mitigating evidence." *Eddings*, 455 U.S. at 114–15, 102 S.Ct. 869. Once the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight. The prosecutor's various comments and questions here simply went to the weight of Anderson's mitigation evidence and were not improper.

### L. Requirement of jury unanimity for leniency

¶ 98 Anderson claims that the penalty phase jury instructions, by requiring jury unanimity for a conclusion that mitigating circumstances were sufficiently substantial to call for leniency, violated the rule of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). *Mills* found unconstitutional the use of jury instructions that risked giving the impression that jurors should not consider mitigating factors not found unanimously, because such an instruction wrongly precluded the jury from considering relevant mitigation. *Id.* at 384, 108 S.Ct. 1860.

¶ 99 The instructions here complied with *Mills*. They stated that while the jury must be unanimous as to the appropriate sentence, "each juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty." The jurors thus were not told that they must unanimously agree on the existence of any particular mitigating circumstance in order to recommend a life sentence.

### M. Denial of Anderson's right to allocution

¶ 100 Anderson argues that his death sentences should be vacated because he was denied the right to allocution. A criminal defendant has a right to make a statement to the jury before imposition of a death sentence. Ariz. R.Crim. P. 19.1(d)(7). This right, however, is not absolute. *State v. Hinchey*, 181 Ariz. 307, 313, 890 P.2d 602, 608 (1995). Even when a defendant is denied a chance to speak before sentencing, "there is no need for resentencing unless the defendant can show that he would have added something to the mitigating evidence already presented." *Id.*

¶ 101 The superior court did not invite Anderson to make a statement before it imposed the death sentences. However, Anderson does not contend he would have presented the court with anything new had he been given the opportunity. More importantly, Anderson testified during the penalty phase hearing. At the conclusion of that testimony, defense counsel asked Anderson to speak directly to the jurors and tell them anything else he wanted them to hear. Anderson did so, and asked for leniency. In light of this statement, and Anderson's failure to argue on appeal what mitigation evidence he would have added had he been offered a final statement before the superior court imposed sentence, we find no need for re-sentencing.

## N. Pecuniary gain aggravating factor

### 1.

¶ 102 Anderson argues that the pecuniary gain aggravating factor, A.R.S. § 13–703(F)(5) (the "(F)(5) aggravator"), impermissibly "duplicates an element" of the crime of felony murder based on armed robbery. Thus, he asserts, the aggravator "bootstrap[s] ... all robbery murders into capital murders" in violation of the Eighth Amendment to the United States Constitution.

¶ 103 This Court, however, has repeatedly held that a conviction for felony murder predicated on robbery or armed robbery does not automatically prove the (F)(5) aggravator. *See, e.g., State v. Kemp,* 185 Ariz. 52, 65, 912 P.2d 1281, 1294 (1996); *State v. Greenway,* 170 Ariz. 155, 163–64, 823 P.2d 22, 30–31 (1991). While armed robbery requires proof of a "taking of property from the victim," the pecuniary gain aggravator requires proof that the defendant's "motivation [for the murder] was the expectation of pecuniary gain." *State v. Carriger,* 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984). The trial court properly instructed the jury that it could not find the (F)(5) aggravator unless the State proved "that the expectation of pecuniary gain was a motive, cause, or impetus for murder and not merely the result of it." The finding of this aggravator thus was not automatically compelled by the felony murder conviction.

### 2.

¶ 104 Anderson argues that because jewelry and a watch were left on the victims there was insufficient evidence to prove the murders were committed for pecuniary gain. He also claims it is "irrational" to find the (F)(5) aggravator as to the murders of Delahunt and Kagen because only Wear's property was stolen. We exercise independent review in determining whether any aggravating circumstance found by the jury was proved beyond a reasonable doubt. A.R.S. § 13–703.04 (Supp.2003).

¶ 105 We conclude that the evidence established beyond a reasonable doubt that a motive for killing all three victims was to steal Wear's truck. Unlike robbery, the pecuniary gain aggravator does not require that property be taken from each victim, but rather only that a murder be prompted by the desire for pecuniary gain. *See State v. LaGrand,* 153 Ariz. 21, 36–37, 734 P.2d 563, 577–78 (1987) (focusing on the cause or motivation of the murder).

## O. Multiple homicides aggravating factor

### 1.

¶ 106 Anderson contends that the trial court's instruction on the multiple-homicides aggravator, A.R.S. § 13–703(F)(8) (the "(F)(8) aggravator"), was deficient for failing to define the term "continuous course of criminal conduct." [17] However, Anderson's trial counsel requested the very instruction of which Anderson now complains. Any error was therefore invited. *Logan,* 200 Ariz. at 565 ¶ 8, 30 P.3d at 632.

### 2.

¶ 107 Anderson next argues that the State failed to prove this aggravator beyond a reasonable doubt. To establish the "multiple homicides" aggravating factor, the State must prove more than simply that the defendant committed more than one homicide around the same time. *Ring III,* 204 Ariz. at 560 ¶ 80, 65 P.3d at 941. Instead, the aggravating homicide must occur "during the commission of the [first-degree murder] offense." A.R.S. § 13–703(F)(8). The aggravator thus requires multiple homicides committed in a "continuous course of criminal conduct," such that the killings have a "temporal, spatial, and motivational relationship[ ]." *State v. Rogovich,* 188 Ariz. 38, 45, 932 P.2d 794, 801 (1997) (quoting *State v. Lavers,* 168 Ariz. 376, 393, 814 P.2d 333, 350 (1991)).

¶ 108 Our independent review confirms that the evidence of this aggravator was

17. The court instructed the jury in relevant part that "in order to find that this aggravating circumstance applies, you must find that the other murder or murders was committed during a continuous course of criminal conduct."

overwhelming. The three murders came within five hours of one another, between about 8:00 p.m. and 12:30 a.m. The murders occurred in close physical proximity, all on the same residential property. The motivation for each of the killings was the same: a desire to steal Wear's truck and leave no witnesses behind to report the crime. There was no error in finding the (F)(8) aggravator.

## P. Especially heinous, cruel or depraved aggravator

### 1.

¶ 109 In *Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled on other grounds by Ring II*, 536 U.S. at 608–09, 122 S.Ct. 2428, the Supreme Court held that Arizona's "especially heinous, cruel or depraved" aggravating circumstance, now set forth in A.R.S. § 13–703(F)(6) (the "(F)(6) aggravator"), was facially vague. *Walton* nonetheless upheld a death sentence based on a finding of that aggravator because the vagueness was remedied by this Court's clarification of its meaning. Our "narrowing construction[s]" gave "substance" to the facially vague aggravator, and the sentencing judge was presumed to apply those constructions because trial judges "know the law and . . . apply it in making their decisions."[18] *Id.* at 653–54. *Walton* held that any error in the use of a vague aggravator can be cured by a state appellate court applying a narrowed construction of the aggravator and determining *de novo* whether the evidence supported the finding of the aggravator. *Id.* at 654. Anderson argues that the rule announced in

*Walton* can no longer justify use of the facially vague (F)(6) aggravator in Arizona because juries, not judges, now find aggravating circumstances.

¶ 110 *Walton* distinguished two cases that reversed death sentences based on facially vague aggravators: *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (involving Oklahoma's "especially heinous, atrocious, or cruel" aggravator), and *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (involving Georgia's "outrageously or wantonly vile, horrible or inhuman" aggravator). *Walton*, 497 U.S. at 653, 110 S.Ct. 3047. The Supreme Court found these cases different from *Walton* in two "constitutionally significant" respects. First, the defendants in *Maynard* and *Godfrey* were sentenced by juries that were not given a "limiting definition" of the aggravator. *Id.* Second, in neither *Maynard* nor *Godfrey* did the state appellate court conduct *de novo* review of the sentencing determination by applying a properly narrowing definition of the aggravating factors. *Id.* These points were "crucial" to the Court's decision in *Maynard* and "equally crucial" to its decision upholding the death sentence in *Walton*. *Id.*

¶ 111 In Anderson's case, the jury was instructed in detail as to what would support a finding that the murders were "especially heinous, cruel or depraved." The jury instructions, to which Anderson did not object, gave substance to the terms "cruel" and "heinous or depraved" in accordance with our case law narrowing and defining those terms.[19] Thus, this case is distinguishable

---

18. "[C]ruelty involves the pain and distress visited upon the victims," and "heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions." *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983). Cruelty may be found when "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997) (internal citation omitted). We have specified five factors that support a finding that a murder was especially heinous or depraved: (1) "the apparent relishing of the murder by the killer," (2) "the infliction of gratuitous violence on the victim," (3) "the needless mutilation of the victim," (4) "the senselessness of the

crime," and (5) "the helplessness of the victim." *Gretzler*, 135 Ariz. at 52, 659 P.2d at 11. We recently defined "gratuitous violence" and "helplessness" in *State v. Jones*, 205 Ariz. 445, 449–450 ¶¶ 16–18, 72 P.3d 1264, 1268–69 (2003).

19. The judge instructed the jury:

The terms "heinous" and "depraved" focus on the defendant's mental state and attitude at the time of the offense as reflected by his words and actions. A murder is especially heinous if it is hatefully or shockingly evil. A murder is depraved if marked by debasement, corruption, perversion or deterioration.

In order to find heinousness or depravity, you must find beyond a reasonable doubt that the defendant exhibited such a mental state at

from *Maynard* and *Godfrey*, in which no limiting instructions were given.

¶ 112 Anderson argues nonetheless that *Walton* cannot save the facially vague (F)(6) aggravator when a jury, as opposed to a judge, performs the initial fact-finding function. His argument rests in large part on *Valerio v. Crawford*, 306 F.3d 742, 747 (9th Cir.2002) (*en banc*), which held that jury instructions regarding proof of "torture, depravity of mind, or mutilation of the victim" were unconstitutionally vague. The Ninth Circuit held that appellate review did not cure the problem, relying on a statement in *Walton* that vagueness was not cured by appellate factfinding when the original trier of fact was a jury. *Id.* at 758 (citing *Walton*, 497 U.S. at 653, 110 S.Ct. 3047).

¶ 113 *Valerio* is easily distinguished. The instructions in *Valerio* failed to define two of the three factors ("torture" and "mutilation"), and the third factor, "depravity of mind," was defined, to use the Court's language in *Walton*, 497 U.S. at 653, 110 S.Ct. 3047, in "terms nearly as vague" as the bare terms of the statute. *See Valerio*, 306 F.3d at 752. The Ninth Circuit therefore concluded that the instructions themselves were unconstitutionally vague. *Id.* at 755–56. Having reached that conclusion, the court went on to hold that appellate review could not cure the vague instructions because the original trier of fact was a jury, not a judge. *Id.* at 758.

¶ 114 The critical distinction here is that the instructions given to Anderson's jury were not unconstitutionally vague. The instructions provided a sufficiently "narrowed

construction," in accordance with decisions of this Court, to the facially vague statutory terms. *Cf. Walton*, 497 U.S. at 653, 110 S.Ct. 3047 ("Neither jury [in *Maynard* or *Godfrey*] was given a constitutional limiting definition of the challenged aggravating factor.... It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face."). Other states have upheld findings of similar aggravators against vagueness attacks when jury instructions provided adequate specificity in accordance with appellate courts' narrowing constructions. *See, e.g., People v. Burgess*, 176 Ill.2d 289, 223 Ill.Dec. 624, 680 N.E.2d 357, 369 (1997); *State v. Wille*, 559 So.2d 1321, 1335–36 (La.1990); *Stouffer v. State*, 742 P.2d 562, 563 (Okla. Crim.App.1987). Likewise, we conclude that the jury instructions here were adequate to provide a narrowed construction of the facially vague statutory terms.

**2.**

¶ 115 Anderson argues that because Poyson actually killed the three victims, the Eighth Amendment forbids imputing the (F)(6) aggravator to Anderson. *See State v. Carlson*, 202 Ariz. 570, 48 P.3d 1180 (2002). The State admits that Anderson did not inflict the fatal blows but maintains that he planned, premeditated, and took part in all three murders. Therefore, the State contends, the aggravator was properly found on the basis of Anderson's own actions.

¶ 116 In *Carlson*, the defendant was convicted of first-degree murder, conspiracy to commit first-degree murder, and first-degree

---

the time of the offense by doing at least one of the following acts: One, relishing the murder. In order to relish a murder the defendant must show by his words or actions that he savored the murder. These words or actions must show debasement or perversion, and not merely that the defendant has a vile state of mind or callous attitude.

Statements suggesting indifference, as well as those reflecting the calculated plan to kill, satisfaction over the apparent success of the plan, extreme callousness, lack of remorse, or bragging after the murder are not enough unless there is evidence that the defendant actually relished the act of murder at or near the time of the killing.

Two, inflicted gratuitous violence on the victim clearly beyond that necessary to kill.

Three, needlessly mutilated the victim's body. In order to find this factor, it must be proven beyond a reasonable doubt that the defendant had a separate purpose beyond murder to mutilate the corpse.

The term "cruel" focuses on the victim's state of mind. Cruelty refers to the pain and suffering the victim experiences before death. A murder is especially cruel when there has been the infliction of pain and suffering in an especially wanton and insensitive or vindictive manner. The defendant must know or should have known that the victim would suffer.

A finding of cruelty requires conclusive evidence that the victim was conscious during the infliction of the violence and experienced significant uncertainty as to his or her ultimate fate. The passage of time is not determinative.

burglary for hiring two young men to kill her mother-in-law. 202 Ariz. at 574–75 ¶¶ 1–9, 48 P.3d at 1184–85. Carlson dropped off the young men at a parking lot near the victim's home and waited for them there. *Id.* at 575 ¶ 8, 48 P.3d at 1185. She was sentenced to death after the judge found three aggravators, including the (F)(6) aggravator. *Id.* at ¶ 10.

¶ 117 On appeal, we held that "[t]here is no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering. The plan must be such that suffering before death must be inherently and reasonably certain to occur, not just an untoward event." *Id.* at 583 ¶ 49, 48 P.3d at 1193. The cruelty finding was not supportable in Carlson's case because she was not present during the murder, did not supply the murder weapon, and was not involved in planning the method of the murder. *Id.* at ¶ 47.[20]

¶ 118 In contrast to Carlson, Anderson was present and actively participated in the two murders for which this aggravator was found. He slit Delahunt's throat, then held the boy down while Poyson pounded a knife into the victim's ear. As to Wear, Anderson hit the victim with a lantern and handed Poyson the cinderblock that delivered the fatal blow. Therefore, the finding of the (F)(6) aggravator for these murders was not based on "vicarious liability," but rather on Anderson's own active participation in the murders.

**3.**

¶ 119 Anderson challenges the sufficiency of the evidence supporting the (F)(6) aggravator.[21] He further argues that because the "especially heinous, cruel or depraved" aggravator is stated in the disjunctive, and "a finding of either cruelty or heinousness/depravity will suffice to establish this factor," *State v. Djerf,* 191 Ariz. 583, 595 ¶ 44, 959 P.2d 1274, 1286 (1998), he was denied the right to a unanimous jury finding of this aggravator. Anderson contends that some jurors could have found the murders especially cruel, while others found them especially heinous/depraved, without jury unanimity as to which prong satisfied the (F)(6) aggravator. We review *de novo* whether the evidence supports findings of aggravating circumstances. *See* A.R.S. § 13–703.04.

**a.**

¶ 120 The jury was instructed that it could find cruelty if "the victim was conscious during the infliction of the violence and experienced significant uncertainty as to his or her ultimate fate." The evidence showed that Delahunt and Wear experienced pain and suffering during the prolonged attacks against them. *See State v. Jones,* 185 Ariz. 471, 487, 917 P.2d 200, 216 (1996) (finding "cruelty" when victim experienced pain and uncertainty about his fate); *State v. Kiles,* 175 Ariz. 358, 371–72, 857 P.2d 1212, 1225–26 (1993) (finding "cruelty" when victim received numerous injuries from prolonged beating). This evidence establishes the cruelty prong of the (F)(6) aggravator.

¶ 121 However, our independent review does not support a finding that the murder of Delahunt or Wear was especially heinous or depraved, as those terms are defined in our case law. As the jury instructions explained, these terms "focus on the defendant's mental state and attitude at the time of the offense as reflected by his words and actions." The court instructed jurors they could make this finding if Anderson relished the murder, inflicted gratuitous violence clearly beyond that necessary to kill, or needlessly mutilated the victim's body.

¶ 122 There was no evidence that Anderson relished the murders. Nor was there mutilation beyond the injuries inflicted by the actual killings. *See State v. Medina,* 193 Ariz. 504, 514 ¶ 38, 975 P.2d 94, 104 (1999) (stating that mutilation involves "distinct acts, apart from the killing itself" com-

---

20. We also found the (F)(6) heinous/depraved finding by the judge unsupported by the facts. *Carlson,* 202 Ariz. at 585 ¶ 56, 48 P.3d at 1195.

21. Even if Anderson had not challenged the findings, we have an independent duty to review the sufficiency of proof of aggravating circumstances relied upon in sentencing. *State v. Poyson,* 198 Ariz. 70, 78 ¶ 23, 7 P.3d 79, 87 (2000).

mitted with the separate purpose to mutilate the victim's corpse).

¶ 123 The issue of gratuitous violence presents a closer question. Both Delahunt and Wear were subjected to prolonged and varied attacks before they succumbed. Delahunt had his throat slashed, a knife pounded into his ear, and his head beaten with a rock. Wear was shot through the jaw, hit over the head with a rifle butt and a lantern, and then killed by blows to the head from a cinder block. While these multiple attacks were reprehensible, they do not meet the (F)(6) test of gratuitous violence. Each attack came in an attempt—albeit clumsy—to kill the victim, not to engage in violence beyond that necessary to kill.

¶ 124 We have found other murders lacking in (F)(6) gratuitous violence despite evidence of repeated assaults. In *State v. Cañez*, 202 Ariz. 133, 42 P.3d 564 (2002), the victim was partially strangled, stabbed six times, and subjected to twenty-one blunt force injuries, ten of them to the head. *Id.* at 161 ¶ 106, 42 P.3d at 592. We nonetheless found the attacks "not grossly in excess of that required to kill," noting that the attacker "merely escalated his attacks until he succeeded in killing" his victim. *Id.* at 161–62 ¶ 106, 42 P.3d at 592–93; *see also State v. Lee*, 189 Ariz. 590, 605, 944 P.2d 1204, 1219 (1997) (finding insufficient evidence of gratuitous violence when victim was hit four times by nine gunshots and record did not indicate time between gunshots or order in which they were fired); *State v. Richmond*, 180 Ariz. 573, 579, 886 P.2d 1329, 1335 (1994) (finding gratuitous violence not established when defendant twice drove over unconscious victim with his car), *abrogated in other part by State v. Mata*, 185 Ariz. 319, 323, 916 P.2d 1035, 1039 (1996).

¶ 125 The evidence here was insufficient to establish that the murder of Delahunt or Wear was especially heinous or depraved for purposes of the (F)(6) aggravator. We therefore turn to Anderson's argument about the potential for a non-unanimous jury verdict on the (F)(6) aggravator.

**b.**

¶ 126 A jury must find an aggravating circumstance unanimously. A.R.S. § 13–703.01(E). The jury here was so instructed and told to make a separate written finding of any aggravating circumstance proved by the State. The jury also was instructed that "the terms 'especially heinous, cruel or depraved' are to be considered separately. Therefore, the presence of any one factor is sufficient to establish that aggravating circumstance." On its verdict form, the jury reported finding the (F)(6) aggravator for the murders of Delahunt and Wear, but did not specify whether it had unanimously found the murders "cruel," "heinous," or "depraved." It is therefore possible the jury was not unanimous as to which prong satisfied the (F)(6) aggravator.

¶ 127 The State argues that the jury need not agree which means satisfied the (F)(6) aggravator, just as jury unanimity is not necessary regarding the means by which first-degree murder is committed when both felony murder and premeditated murder theories are presented. *See Schad v. Arizona*, 501 U.S. 624, 632, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991); *State v. Tucker*, 205 Ariz. 157, 167 ¶ 50, 68 P.3d 110, 120 (2003); *State v. Encinas*, 132 Ariz. 493, 496–97, 647 P.2d 624, 627–28 (1982).

¶ 128 The State's argument is compelling when the evidence is sufficient to satisfy each alternative prong of an aggravating circumstance. *See State v. Carreon*, 210 Ariz. 54, 65–66 ¶¶ 51–57, 107 P.3d 900, 911–12 (2005) (concluding that the A.R.S. § 13–703(F)(2) aggravator is established when sufficient evidence is presented of two convictions for serious offenses, even in the absence of a showing that jurors all relied on the same conviction); *State v. Forrester*, 134 Ariz. 444, 447, 657 P.2d 432, 435 (App.1982) ("If a statute describes a single offense which may be committed in more than one way, it is unnecessary for there to be unanimity as to the means by which the crime is committed provided there is substantial evidence to support each of the means charged."); *accord State v. Keen*, 31 S.W.3d 196, 209 (Tenn.2000) (holding that different jurors may rely on different theories to find the "especially heinous,

atrocious or cruel" aggravator "[s]o long as the proof is sufficient under either theory for finding the aggravating circumstance beyond a reasonable doubt, and so long as all jurors agree that the aggravating circumstance is present and applicable to the case at hand"). But the State's argument falters when the evidence is insufficient to support one or more of the alternative grounds.

¶ 129 We addressed this latter situation in *State v. Lopez*, 158 Ariz. 258, 762 P.2d 545 (1988), which involved a general jury verdict of guilt for first-degree murder that did not specify whether jurors unanimously found either felony murder or premeditated murder. We held that the evidence was insufficient to prove the alleged felony and thus concluded that the defendant should have been acquitted of felony murder. *Id.* at 264, 762 P.2d at 551. And, because we could not tell whether one or more jurors had found the defendant guilty only of felony murder, we also overturned the first-degree murder conviction: "Since the jury's verdict may have been based, in whole or in part, on the impermissible felony murder theory, we must reverse defendant's conviction for first degree murder and remand that count for a new trial on the premeditation theory only." *Id.* at 266, 762 P.2d at 553.

¶ 130 In the case before us, we likewise cannot discern whether the jury's findings of the (F)(6) aggravator "may have been based, in whole or in part" on the heinous/depraved prong. Thus, we cannot be sure that the jury unanimously found a proper basis for the (F)(6) aggravator for the murders of Wear and Delahunt. We therefore will not consider the jury's findings of the (F)(6) aggravator in our consideration of the appropriate sentence for the murders of Delahunt and Wear.[22]

¶ 131 Trial courts may easily avoid this problem by requiring juries to make separate findings as to each prong of the (F)(6) aggravator submitted to them. We urge trial courts to do so. *Cf. State v. Smith,* 160 Ariz. 507, 513, 774 P.2d 811, 817 (1989) (urging trial courts to use alternative verdict forms to facilitate appellate review of first-degree murder convictions for cases submitted to jury on both premeditated and felony-murder theories).

## Q. Review of the jury's aggravation and sentencing findings

¶ 132 We review *de novo* the jury's determination that the death penalty is warranted. A.R.S. § 13-703.04.[23] When we determine that an aggravating circumstance has been found erroneously, we must "independently determine if the mitigation ... is sufficiently substantial to warrant leniency in light of the existing aggravation." A.R.S. § 13-703.04(B). *See Carreon,* 210 Ariz. at 73 ¶ 96, 107 P.3d at 919.[24]

¶ 133 In making this determination, we do not simply consider the number of aggravating and mitigating factors, but instead consider the "quality and strength" of each. *Id.* at ¶ 97 (quoting *State v. Greene,* 192 Ariz. 431, 443 ¶ 60, 967 P.2d 106, 118 (1998)). In this case, the "quality and strength" of the (F)(5) and (F)(8) aggravating circumstances are compelling. The evidence convincingly established that Anderson planned and carried out the murders of three victims in order to steal a pickup truck.

¶ 134 Anderson urged the following mitigation: (1) his turbulent childhood, including

---

**22.** Error on this point was arguably harmless in light of the compelling evidence of (F)(6) cruelty in both murders. However, the State does not so argue in its brief. In any event, our independent re-weighing of the remaining aggravating circumstances and the mitigation evidence results in the affirmance of the death sentences for the murders of Delahunt and Wear even absent this aggravator. *See infra* ¶¶ 132-37.

**23.** Anderson initially argued that recent amendments to Arizona's capital sentencing statute providing for "abuse of discretion" review of jury findings, *see* A.R.S. § 13-703.05(A) (Supp.2003), violate the Eighth and Fourteenth Amendments to the United States Constitution. However, Anderson committed the murders before the effective date of the new statute, and the independent review standard in A.R.S. § 13-703.04 remains applicable to this case. 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7(C).

**24.** We may remand a case "for further action if the trial court erroneously excluded evidence or if the appellate record does not adequately reflect the evidence presented." A.R.S. § 13-703.04(C). This is not such a case.

sexual abuse by his father and lack of stability, caused in part by frequent moves and attendance at more than fifty schools; (2) his below-average I.Q. and "follower" personality; (3) his relatively minor participation in the crimes compared with Poyson; (4) his acting under duress and fear of Poyson; (5) the comparatively lenient eight-year sentence that Lane received; (6) his cooperation with police by confessing to participation in the murders; (7) his good record as an inmate; and (8) his embrace of religion and Christian ministry to fellow inmates.

¶ 135 We conclude that these mitigating factors are not sufficiently substantial to call for leniency. Although there was evidence at trial that Anderson's I.Q. was below average and that he did not have a leader-type personality, he was not mentally retarded, unable to make his own decisions, or lacking the capacity to judge right from wrong. We similarly cannot give much weight to Anderson's fear of Poyson; there is simply no credible evidence that Anderson was coerced into committing these murders.

¶ 136 Moreover, Anderson's childhood troubles do not in any way explain his decision, decades later at age forty-eight, to kill three innocent people to steal a pickup. Given Anderson's substantial role in each of the murders, we reject his characterization of his participation as minor. Nor can Anderson's limited cooperation with the police be viewed as substantial mitigation. And, while Lane received a far more lenient sentence than Anderson under her plea bargain with the State, her involvement in the murders was far less substantial than Anderson's and she was but fourteen years old at the time of the murders.

¶ 137 There was evidence that Anderson has been a model inmate and has made efforts to assist fellow inmates through his Christian ministry. While laudable, these mitigating facts are not nearly substantial enough to call for leniency in light of the aggravating circumstances. Exercising independent review pursuant to A.R.S. § 13–703.04(B), we therefore affirm the death sentence for each of the three murders.

### R. Consecutive sentences for murders, conspiracy, and robbery

#### 1.

¶ 138 Anderson argues that his sentences for armed robbery and conspiracy to commit first-degree murder constitute double punishment because they run consecutively to the death sentences. He claims the consecutive sentences violate constitutional prohibitions of double jeopardy as well as Arizona statute.

¶ 139 Under the Double Jeopardy Clause of the U.S. Constitution, consecutive sentences are permissible only if each crime requires proof of at least one separate element:

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

*Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Thus, in analyzing double jeopardy claims, the court must "examine the elements of the crimes for which the individual was sentenced" to ensure that each crime contains an element not present in the other. *State v. Eagle*, 196 Ariz. 188, 190 ¶ 6, 994 P.2d 395, 397 (2000). Because each of the crimes of which Anderson was convicted requires proof of elements not included in the others, Anderson's double jeopardy claim fails.[25]

#### 2.

¶ 140 Anderson's statutory claim is based on A.R.S. § 13–116 (1989), which provides that "[a]n act or omission which is made punishable in different ways by differ-

---

25. First-degree premeditated murder requires proof of intent to kill, an actual killing and premeditation. A.R.S. § 13–1105. Conspiracy to commit first-degree murder, in addition to requiring an intent to kill, requires proof of an agreement to commit first-degree murder. A.R.S. § 13–1003(A). Armed robbery requires proof of elements wholly separate from first-degree murder, including proof that the defendant, while armed, used force or threats of force to take property from the victim or the victim's immediate presence. A.R.S. §§ 13–1902, –1904.

ent sections of the laws may be punished under both, but in no event may sentences be other than concurrent." The statute precludes the imposition of consecutive sentences when the defendant's conduct is a "single act." *State v. Gordon,* 161 Ariz. 308, 312, 778 P.2d 1204, 1208 (1989). We apply the following test to determine whether conduct is a "single act":

> [W]e will ... judge a defendant's eligibility for consecutive sentences by considering the facts of each crime separately, subtracting from the factual transaction the evidence necessary to convict on the ultimate charge—the one that is at the essence of the factual nexus and that will often be the most serious of the charges. If the remaining evidence satisfies the elements of the other crime, then consecutive sentences may be permissible under A.R.S. § 13–116. In applying this analytical framework, however, we will then consider whether, given the entire "transaction," it was factually impossible to commit the ultimate crime without also committing the secondary crime. If so, then the likelihood will increase that the defendant committed a single act under A.R.S. § 13–116. We will then consider whether the defendant's conduct in committing the lesser crime caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime. If so, then ordinarily the court should find that the defendant committed multiple acts and should receive consecutive sentences.

*Id.* at 315, 778 P.2d at 1211.

¶ 141 The parties agree that premeditated first-degree murder was the "ultimate crime" in this case.[26] A person commits premeditated first-degree murder when: "Intending or knowing that the person's conduct will cause death, the person causes the death of another with premeditation." A.R.S. § 13–1105(A)(1).

### a.

¶ 142 A person is guilty of conspiracy if, "with the intent to promote or aid the commission of an offense, such person agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense." A.R.S. § 13–1003(A). A conspiracy to commit murder is a completed offense at the time of the agreement to commit the offense. *Id.*

¶ 143 There are plainly sufficient facts remaining here, after subtracting those necessary for the murder convictions, to support the conspiracy conviction. The most obvious of these remaining facts is the prior agreement to kill, which is not an element of first-degree murder. The next question is whether, under the facts of this case, the ultimate crime could have been committed in the absence of the conspiracy. The answer is yes: it was factually possible for Anderson to commit the murders without first conspiring with Poyson and Lane to do so. Indeed, Anderson denied that there was an agreement to kill the victims and claimed that his participation in the murders was the result of pressure applied by Poyson. *See State v. Khoshbin,* 166 Ariz. 570, 575, 804 P.2d 103, 108 (App.1990) (affirming consecutive life sentences for first-degree murder and conspiracy to commit murder when the crimes were "separate and distinct and occurred at different times").

### b.

¶ 144 We also conclude that it was lawful to impose the armed robbery sentence consecutively to the sentences for first-degree murder. It is clear that after subtracting the facts necessary to support the premeditated murder convictions, remaining facts—showing a taking of the pickup and other items by use of force and deadly weapons—were sufficient to prove armed robbery. Furthermore, it plainly was factually possible for Anderson to have committed the murders without committing armed robbery. Finally, the offenses—one involving the use or threat of force to violate another's property interest,

26. Because the jury unanimously found both premeditated and felony murder, we need only consider the premeditated first-degree murder conviction. In any event, the disposition of this issue would be no different if we instead were to consider felony murder as the ultimate crime. *See State v. Runningeagle,* 176 Ariz. 59, 67, 859 P.2d 169, 177 (1993).

the other causing a loss of life—present very different risks of harm to the victims.

## S. *Blakely* sentencing issues for non-capital convictions

¶ 145 Anderson contends that the trial judge violated the rule in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), by imposing aggravated sentences for Anderson's non-capital offenses without a jury determination of aggravating factors. But the sentence imposed for the conspiracy conviction—life imprisonment without the possibility of parole for twenty-five years—was authorized without any finding of aggravating circumstances. See A.R.S. § 13–1003(D). Thus, no further jury finding was required. The sentence of twelve and one-half years imprisonment for armed robbery, however, required a finding of at least two substantial aggravating factors. *See id.* § 13–1904(B) (1989); *id.* § 13–702.01(A)(1) (Supp.1996). We will decide in a supplemental opinion whether the trial judge erred by imposing the aggravated sentence for armed robbery without jury findings of aggravating circumstances.

## T. Other arguments preserved for future review

¶ 146 Anderson raises fourteen other constitutional challenges to preserve them for review in the federal courts. He acknowledges that each has been rejected by this Court, but invites the Court to revisit its jurisprudence. The claims, as stated by Anderson, are listed at Appendix A, followed by citations to cases that Anderson states have rejected each claim. In the absence of any argument why our prior decisions should be overturned, we will not re-address those decisions here.

## IV. Conclusion

¶ 147 For the foregoing reasons, we affirm the convictions and sentences imposed by the superior court, with the exception of the armed robbery sentence, which we will address in a supplemental opinion.

CONCURRING: CHARLES E. JONES, Chief Justice, RUTH V. McGREGOR, Vice Chief Justice, REBECCA WHITE BERCH and MICHAEL D. RYAN, Justices.

## APPENDIX A

Anderson raises the following claims to preserve them for federal review.

(1) The death penalty is *per se* cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 186–87, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992); *State v. Gillies*, 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983).

(2) Execution by lethal injection is cruel and unusual punishment. *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

(3) The statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. *Walton v. Arizona*, 497 U.S. 639, 648, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996); *State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995).

(4) The death statute is unconstitutional because it fails to guide the sentencing jury. *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

(5) Arizona's death statute unconstitutionally requires defendants to prove that their lives should be spared. *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

(6) The statute unconstitutionally fails to require either cumulative consideration of multiple mitigating factors or that the jury make specific findings as to each mitigating factor. *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995); *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994); *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

(7) Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

(8) The statute is unconstitutional because there are no statutory standards for weighing. *State v. Atwood,* 171 Ariz. 576, 645–46 n. 21(4), 832 P.2d 593, 662–63 n. 21(4) (1992).

(9) Arizona's death statute insufficiently channels the sentencer's discretion in imposing the death sentence. *State v. West,* 176 Ariz. 432, 454, 862 P.2d 192, 214 (1993); *Greenway,* 170 Ariz. at 162, 823 P.2d at 31.

(10) Arizona's death statute is unconstitutionally defective because it fails to require the State to prove that death is appropriate. *Gulbrandson,* 184 Ariz. at 72, 906 P.2d at 605.

(11) The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards. *Salazar,* 173 Ariz. at 411, 844 P.2d at 578.

(12) Death sentences in Arizona have been applied arbitrarily and irrationally and in a discriminatory manner against impoverished males whose victims have been Caucasian. *West,* 176 Ariz. at 455, 862 P.2d at 215.

(13) The Constitution requires a proportionality review of a defendant's death sentence. *Salazar,* 173 Ariz. at 416, 844 P.2d at 583; *State v. Serna,* 163 Ariz. 260, 269–70, 787 P.2d 1056, 1065–66 (1990).

(14) There is no meaningful distinction between capital and non-capital cases. *Salazar,* 173 Ariz. at 411, 844 P.2d at 578.

